IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

FILED

MAY 2 1 20..

DAVID W. DANIEL, CLERK
US DISTRICT COURT, EDNC
BY ___K___ DEP. CLERK

| | | |
|---|---|---|
| NORTH CAROLINA STATE UNIVERSITY and CREE, INC., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No.: 5:00-CV-703-F(2) |
| v. | ) ) | |
| NICHIA CORPORATION and NICHIA AMERICA CORPORATION, | ) ) ) | **CREE'S RESPONSE TO OBJECTIONS OF NICHIA CORPORATION TO THE DECLARATION OF SHUJI NAKAMURA IN SUPPORT OF MOTION TO DISMISS** |
| Defendants. | ) ) | |
| NICHIA CORPORATION and NICHIA AMERICA CORPORATION, | ) ) | |
| Counterclaimants, | ) ) | |
| v. | ) ) ) | |
| NORTH CAROLINA STATE UNIVERSITY, CREE, INC. and SHUJI NAKAMURA, | ) ) ) ) | |
| Counterdefendants. | ) ) | |

OF COUNSEL FOR CREE and NAKAMURA

Matthew D. Powers
Christopher J. Cox
Weil, Gotshal & Manges LLP
2882 Sand Hill Road, Suite 280
Menlo Park, California 94025-7002
(650) 926-6200
(650) 854-3713 (facsimile)

David C. Radulescu
Matthew J. Antonelli
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000
(212) 310-8007 (facsimile)

ATTORNEYS FOR NCSU, CREE, and NAKAMURA

James D. Myers (NC Bar No. 6,305)
D. Randal Ayers (NC Bar No. 20,830)
Myers Bigel Sibley & Sajovec
Post Office Box 37428
Raleigh, North Carolina 27627
(919) 854-1400
(919) 854-1401 (facsimile)

ATTORNEYS FOR CREE
J. Anthony Penry
Ellis & Winters LLP
Post Office Box 33550
Raleigh, North Carolina 27636
(919) 865-7000

## I.    INTRODUCTION

Cree, Inc. ("Cree") submits this brief in opposition to the May 7, 2001 *Objections of Defendant Nichia Corporation to the Declaration of Shuji Nakamura, Ph.D., in Support of Motion to Dismiss* (herein *"Objections to Nakamura Declaration"*).  While Nichia has titled its submission as "objections" to the Nakamura Declaration, Nichia's paper in fact constitutes a motion to **strike** the Nakamura Declaration.  (*See Objections to Nakamura Declaration*, pp. 1, 4).  However, before filing this motion Nichia never contacted Cree regarding its objections -- as expressly required by both Fed. R. Civ. P. 37(a)(2) and Local Rule 4.03 -- or otherwise attempted to resolve this "dispute" without the need for Court intervention.  More importantly, five days **before** Nichia filed its "objections" to the Nakamura Declaration, the parties had agreed that each side would have until June 1, 2001 to produce certain documents, **specifically including documents relating to Nakamura's residency, immigration status and employment relationships**.  (*See* May 10, 2001 Letter from Nichia's Counsel, pp. 1-2. ¶¶ 1-3, Ex. 1).  Thus, Nichia's own correspondence verifies the **absence** of any dispute relating to discovery the Nakamura Declaration.  Consequently, this Court should reject Nichia's after-the-fact attempt to fabricate a dispute as a means of striking Cree's showing that Nichia's motion for leave to amend should be denied.

Nichia's motion to strike the Nakamura Declaration should also be denied because there is no real dispute regarding the limited facts set forth in the Nakamura Declaration.  Indeed, for the most part, the facts set out in the Nakamura Declaration are also stated in **Nichia's** proposed amended answer and counterclaim, and, in any event, are readily ascertainable from sources whose accuracy cannot reasonably be questioned and thus are subject to judicial notice.  Moreover, as noted above, Cree will be producing the requested information regarding Nakamura's residency and employment **within the next ten days** pursuant to the parties'

agreement to exchange documents on June 1, 2001, and would have produced them earlier had Nichia notified Cree of its purported need for such documents in preparing its reply brief on its motion for leave to amend. Thus, for all the above reasons, this Court should reject Nichia's request that the Nakamura Declaration be stricken from the record.

## II. FACTUAL BACKGROUND

On February 20, 2001, Cree filed a motion to dismiss all of Nichia's state law counterclaims under Fed. R. Civ. P. 12(b)(1), Rule 12(b)(6) and/or under the doctrine of *forum non conveniens*. The Nakamura Declaration was filed in support of this motion to dismiss. In lieu of opposing Cree's motion to dismiss, Nichia filed a motion for leave to file a first amended answer and counterclaim. On April 23, 2001, Cree filed an opposition to Nichia's motion for leave to amend. The Nakamura Declaration was re-filed as an exhibit to this opposition as support for the following facts:

- Cree is a resident of the Middle District of North Carolina; Cree Lighting is a resident of the Central District of California; and Dr. Nakamura is Japanese citizen living in the Central District of California (Cree Opposition, pp. 4-5); and

- Dr. Nakamura is a full-time employee of the University of California at Santa Barbara ("UCSB") and is a part-time employee of Cree Lighting, both of which are located in Santa Barbara County, California (Cree Opposition, p. 5).

Until the filing of its "objections," Nichia had never asserted that it needed specific discovery relating to the Nakamura Declaration in order to respond to Cree's opposition to its motion for leave to amend. It is only now, nearly three months after the Nakamura Declaration was first served on Nichia, that Nichia has objected to it. Moreover, while Nichia noticed Dr. Nakamura's deposition for May 2, 2001 and requested that Dr. Nakamura respond to Nichia's outstanding document requests by April 16, 2001, Nichia never indicated that it needed to question Dr. Nakamura about his declaration or that it needed to receive certain documents in order to respond to Cree's opposition to its motion for leave to amend.

Moreover, what Nichia fails to inform this Court is that Nichia itself has yet to produce any documents whatsoever in response to the vast majority of Cree's document requests. As a result, the parties exchanged a series of discovery dispute letters throughout April of 2001, which culminated in a two-day teleconference between counsel on May 2-3, 2001. During that teleconference, thirty-odd categories of documents which the parties were most interested in obtaining were identified, and the parties agreed that these documents would be collected and produced (subject to objections or difficulties associated with the sheer volume of documents involved) by June 1, 2001.[1] Thus, **five days before** filing its "objections" to the Nakamura Declaration, Nichia's counsel expressly indicated that Cree and Nakamura did **not** need to produce the documents in question until June 1, 2001 (*i.e.,* the same time that Nichia would be producing documents in response to Cree's discovery requests). During the May 2-3, 2001 teleconference, the parties also agreed to suspend their pending notices of deposition (including Nichia's noticed deposition of Dr. Nakamura), with the understanding that these depositions would be rescheduled after the parties exchanged documents on June 1, 2001. At no time during these discussions, or during the follow-up correspondence, did Nichia provide any indication that it believed that Nichia needed certain documents to respond to Cree's opposition to Nichia's motion for leave to amend.

## III.  ARGUMENT

### A.  Nichia's Request Should be Denied Since Nichia Did Not Attempt to Resolve this Dispute Without Court Intervention

As an initial matter, Nichia's request that this Court strike the Nakamura Declaration should be denied based on Nichia's failures to make a good faith effort to resolve this "dispute"

---

[1] This agreement is reflected in a May 10, 2001 confirmation letter by Nichia's counsel, as modified by several letters that further clarify the parties' agreement. (Follow-up Letters, Ex. 2).

prior to seeking court intervention. Pursuant to this Court's rules, counsel for a party must "certify that there has been a good faith effort to resolve discovery disputes prior to the filing of any discovery motions." Local Rule 4.03. As should be clear from the above, Nichia never made any such good faith efforts, and the required certification is conspicuously absent from Nichia's submission to this Court. Nichia's request that this Court "disregard" the Nakamura Declaration as a discovery sanction also violates Fed. R. Civ. P. 37(a)(2), which requires a movant to certify that it has "in good faith conferred or attempted to confer with the party not making the disclosure in an effort to secure the disclosure without court action." There would be no "dispute" here had Nichia complied with its meet and confer requirements before launching its "objections" to the Nakamura Declaration, as Cree has been gathering and reviewing the very documents at issue, along with many tens of thousands of other documents, in preparation for the parties June 1, 2001 exchange of documents. Thus, this Court should deny Nichia's request.

### B. No Dispute Ever Existed Regarding Nichia's Need for Discovery Relating to the Nakamura Declaration

Nichia's motion to strike the Nakamura Declaration is independently objectionable because Nichia had already agreed that Cree had until June 1, 2001 to produce the documents in question. In particular, after this Court ordered the parties to move forward with discovery on March 15, 2001, the parties exchanged a series of letters relating to the other parties' failures to produce documents. In an effort to amicably resolve these disputes, counsel for the parties held a teleconference on May 2-3, 2001 during which the parties identified 30-odd categories of potentially relevant documents which the parties would attempt to gather and produce (unless otherwise objected to) on an expedited basis to allow deposition discovery to go forward. (*See* May 10, 2001 Letter from Nichia's Counsel, Ex. 1). During that teleconference, counsel expressly discussed documents relating to Nakamura's residency, immigration status and

employment relationships, and agreed that they were to be produced by June 1, 2001. (*Id.*, pp. 1-2, ¶¶ 1-3, Ex. 1). Counsel for Nichia also voluntarily suspended its noticed deposition of Dr. Nakamura during that teleconference. (*Id.*, p. 4, Ex. 1). In light of that suspension, Nichia's argument that "Nakamura has not been produced for his deposition" is clearly misleading. (*See Objections to Nakamura Declaration*, p. 3).

Moreover, at no time did Nichia ever notify Cree regarding its purported need for specific discovery related to the Nakamura Declaration in order to respond to Cree's opposition to its motion for leave to amend. Significantly, the discovery requests cited in Nichia's submission to this Court were not only directed to the Nakamura Declaration, and Cree believed that these documents were being sought for general discovery purposes and thus were no different than the tens or hundreds of thousands of other documents that Nichia has requested that Cree is in the process of collecting, reviewing and copying for production by June 1, 2001.

Thus, as Nichia expressly agreed that Cree had until June 1, 2001 to provide the discovery at issue, and at no time informed Cree of its purported need for production of these documents sooner, it is clear that there never was any "dispute" which would justify the intervention of this Court. *See Regents of the University of California v. Synbiotics Corp.*, 1993 WL 645929, *3 (S.D. Cal., Oct. 13, 1993) (denying motion to strike declarations where movant had delayed requesting discovery regarding the declarations) (copy attached as Ex. 3). In fact, Nichia's own correspondence makes clear that Nichia's "objections" are not motivated by any failure of Cree in the discovery process, but instead by Nichia's need to find some way to avoid denial of its pending motion for leave to assert numerous additional inappropriate counterclaims. Consequently, given the lack of any discovery dispute, this Court should deny Nichia's motion to strike the Nakamura Declaration.

**C.   There Is No Genuine Dispute About The Facts Supported by the Nakamura Declaration**

Nichia's request that this Court "disregard" the Nakamura Declaration should also be rejected because there can be no genuine dispute about the facts asserted in that declaration. In fact, Nichia has itself asserted most of the facts from the Nakamura Declaration in its proposed amended answer and counterclaim. These facts are also readily ascertainable from sources whose accuracy cannot reasonably be questioned, and are thus subject to judicial notice. Accordingly, Nichia will face no prejudice if the Court considers the Nakamura Declaration in deciding Nichia's motion for leave to amend.

The first set of facts supported by the Nakamura Declaration concern the residency of Cree, Cree, Lighting, and Dr. Nakamura. In its opposition, Cree stated that Cree is a resident of the Middle District of North Carolina, Cree Lighting is a resident of the Central District of California, and that Dr. Nakamura is a Japanese citizen living in the Central District of California. These facts are not reasonably subject to dispute, and Nichia seeks to assert most of them in its proposed first amended answer and counterclaim. Nichia's proposed amended answer states that Cree is a corporation with a principal place of business in North Carolina. (Proposed Amended Answer, p. 4, ¶ 2). It states that Cree Lighting is a corporation formed under the laws of California. (Proposed Amended Answer, p. 4, ¶ 3). It also states that Dr. Nakamura "is a citizen of Japan and resides in the United States." (Proposed Amended Answer, p. 4, ¶ 4). Moreover, as discussed in Cree's original motion to dismiss, these facts are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned, and thus the Court may take judicial notice of them. (Brief, pp. 1, 3, and 4).

The second set of facts supported by the Nakamura Declaration concern Dr. Nakamura's employment. Cree's opposition to Nichia's motion for leave to file an amended answer and

counterclaim states that Dr. Nakamura is a full-time employee of UCSB and a part-time employee of Cree Lighting, both of which are located in Santa Barbara County, California. These facts are also largely conceded by Nichia. Nichia's proposed amended answer states that in or about February 2000, Dr. Nakamura accepted a position at the University of California. It also states that Dr. Nakamura began working for Nitres, Inc., which later was named Cree Lighting. (Proposed Amended Answer, pp. 10-11, ¶¶ 17, 18). As discussed in Cree's original motion to dismiss, that UCSB and Cree Lighting are located in Santa Barbara County is a fact that is readily ascertainable by resort to sources whose accuracy cannot reasonably be questioned, and thus the Court may take judicial notice of it. (Brief, pp. 1, 3, and 4).

Because there can be no real dispute about the facts set forth in Cree's opposition that are supported by Dr. Nakamura's declaration, Nichia can point to no prejudice that would result from the Court's consideration of the Nakamura Declaration. This provides yet another independent basis for denying Nichia's request that this Court "disregard" the Nakamura Declaration.

## IV.   CONCLUSION

For the foregoing reasons, the relief requested in Nichia's *Objections to Nakamura's Declaration* should be denied.

Respectfully submitted this the 21st day of May, 2001.

By: _____
James D. Myers (#6305)
D. Randal Ayers (#20830)
Myers Bigel Sibley & Sajovec
Post Office Box 37428
Raleigh, North Carolina 27627
(919) 854-1400

COUNSEL FOR NORTH CAROLINA
STATE UNIVERSITY, CREE, INC. and
SHUJI NAKAMURA

A *Partnership Including*
*Professional Corporations*
18191 Von Karman Avenue
Suite 500
Irvine, CA 92612-0187
949-851-0633
Facsimile 949-851-9348
www.mwe.com

**Fay E. Morisseau**
Attorney at Law
fmorisseau@mwe.com
949-757-7115

Boston
Chicago
London
Los Angeles
Miami
Moscow
New York
Orange County
St. Petersburg
Silicon Valley
Vilnius
Washington, D.C.

# McDermott, Will & Emery

May 10, 2001

<u>**VIA FACSIMILE AND MAIL**</u>

D. Randal Ayers
Meyers Bigel Sibley & Sajovec, P.A.
P. O. Box 34728
Raleigh, NC 27627

   Re: North Carolina State University, et al. v. Nichia Corporation, et al.
     <u>Case No. 5:00-CV-703-F(2)</u>

Dear Mr. Ayers:

   This letter is written to memorialize our telephone conversations of May 2nd and 3rd, 2001, regarding the outstanding discovery issues between the parties. During those phone conversations, we agreed to see if we could develop a list of documents that the attorneys could use as a guide to producing relevant documents. During those conversations, I volunteered to write this letter, with the understanding that you reserved the right to review and suggest changes to anything I said in the letter.

   First, we agreed that our conversations, our agreement to create a list of documents reflected in the letter, and the production of documents pursuant to such list would not constitute a waiver by any party of (a) any document request, (b) any objection to a document request, (c) any right to compel production of documents, and (d) any right to seek protection from document production.

   Next, we agreed that we would consult with our clients regarding producing the following list of documents, and we acknowledge that neither of us had the authority to bind our clients to produce documents until after we have consulted with them. The documents listed would include documents within the possession or control of any party or any of its subsidiaries.

   1. Paychecks, expense checks, income tax statements, employment agreements, consulting agreements, and invoices of Shuji Nakamura ("Nakamura") within the possession or control of Cree, Cree Lighting, Nitres, NCSU or Nakamura relating to work performed by Nakamura for Cree, Cree Lighting, Nitres, NCSU or UCSB.

D. Randal Ayers
Meyers Bigel Sibley & Sajovec, P.A.
May 10, 2001
Page 2

2.  Nakamura's work visa, green cards, and immigration applications, and correspondence with immigration attorneys of Nakamura, within the possession or control of Cree, Nakamura or NCSU.

3.  All travel expenses of Nakamura to, or from, or in North Carolina; all credit card statements showing purchases of products or services by Nakamura in North Carolina; and all phone records of Nakamura from 1/1/99 to present showing telephone calls to Cree, Cree Lighting, Nitres, NCSU or Emcore, to the extent that any of said documents are within the possession or control of Nakamura, Cree, Cree Lighting, Nitres or NCSU.

4.  Patent Application files, both U. S. and foreign, for all patents in suit. This would include "related" applications-parents, continuations, continuation-in-parts, and divisionals, in either direction.

5.  Inventor notebooks for each inventor for each of the patents in suit for the time period starting two years before the application for the patent (or ultimate parent of the patent application) to the present. Also, all notebooks for other writings reflecting conception or development of the inventions of the patent in suit or Nichia trade secrets, but only to the extent that the notebooks or other writings relate to the conceptions or development of inventions of the patent in suit or the Nichia trade secrets.

6.  Process specifications for Cree's GaN LEDs and laser diodes as of 1/1/96, and all changes to the process from that date. Also process specifications for Nichia's GaN LEDs and laser diodes as of 1/1/88, and all changes from that date, but limited by the scope of Nichia's trade secret listing in the interrogatory answers.

7.  Product specifications for Cree's GaN LEDs and laser diodes as of 1/1/96, and all changes to the specifications from that date. Also product specifications for Nichia's LEDs and laser diodes as of 1/1/88, and all changes from that date, limited by the scope of the Nichia's trade secret listing in the interrogatory answers. We are assuming that the product specifications will include information concerning the layer structure of the products such as chemical composition and physical properties of each layer. If not, then each party will identify documents that show these details.

8.  Drawings and schematics for each GaN LED and laser diode product for which product specifications are produced with respect to category 7 above.

9.  All documents from Nakamura's files and Nakamura's e-mails (both to and from) within the possession or control of Cree, NCSU, Nichia, or Nakamura.

10.  Files of the inventors for the patent-in-suit relating to GaN semiconductors, LEDs and laser diodes.

11.  Reports relating to ELOG and products that are made by an ELOG process.

12.  All tests results and analysis of the other party's products.

13.  All measurements of defect densities for ELOG structures.

14.  Agreements between Cree and Cree Lighting regarding research, development, manufacturing and marketing.

15.  Organizational charts from 1990 to the present.

16.  License agreement between NCSU and Cree, as well as all amendments to the agreement (Note: the license agreement was produced on March 9, 2001).

17.  Invoices, purchase orders, and quotations from 1/1/99 to present by Cree from equipment manufacturers to be identified by Nichia.

18.  Invention disclosure statements as permitted under applicable Federal Circuit law.

19.  Documents relating to invalidity and unenforceability defenses, e.g., prior art.

20.  Licensing agreements, and correspondence regarding licensing, for GaN LEDs and laser diodes.

21.  Inventor notebooks for each inventor for U. S. Patent No. 6,153,010 for the time period starting two years before the application date for the patent (or ultimate parent of the patent application) to present. Also, all notebooks or other writings reflecting conception or development of the patented inventions covered by U. S. Patent No. 6,153,010, but only to the extent that the notebooks or other writings relate to the conception or development of the patent invention covered by U. S. Patent No. 6,153,010.

22.  All publications and presentations written or given in whole or in part by any of the named inventors or anyone involved from a technical viewpoint in the design and development of the Nichia trade secrets.

23.  All Nichia patent applications published in Japan from 1989 to date.

24.  Documents relating to misappropriation of trade secrets and violation of CFAA, e.g. documents identifying Nichia's trade secrets, documents showing what information was removed or transferred from Nichia's computers, and documents showing Cree's use or possession or knowledge of Nichia's trade secrets.

25.  Documents sufficient to identify any lawsuit, judicial proceeding, arbitration, patent interferences, appeal, or reissue or reexamination proceeding, or patent opposition or cancellation proceeding involving any patents-in-suit, their parent or child patent application or patents, or their counterpart patent applications or patents.

26.  Documents sufficient to identify any lawsuit or judicial proceeding involving any trade secret or confidential information that forms the basis of any of Nichia's trade secrets disclosed in Nichia's answers to interrogatories.

27.     Documents relating to any parties' first sale, offer for sale, public use or demonstration of any product covered by any of the patents in suit, or any product that uses, embodies, or that is made in accordance with any of the alleged trade secret or confidential information that forms the basis of the Nichia counterclaims.

28.     All opinions received by any party concerning any patent-in-suit, or any related applications or patents or any of their foreign counterparts or priority patents or patent applications.

29.     All publications (articles, patents, etc.) on GaN based LEDs and laser diodes within the possession of any engineer or scientist in Cree's, NCSU or Nichia's GaN LEDs and laser diode Research group.  The parties will provide the names of the engineers and scientists consulted.

30.     Copies of any documents or prior art referred to in Plaintiffs' Reply to Nichia's counterclaims (paragraph 4-31) in connection with plaintiffs' allegations that Nichia procured its patents through inequitable conduct and that Nichia is engaged in unfair competition by asserting them in this action.

31.     As set forth in the jointly drafted correspondence dated April 27, 2001, counsel will advise their respective clients that ten (10) is the appropriate number of samples to be produced at this time for each LED product (sold or offered for sale in the United States) that incorporates or allegedly infringes upon the patents-in-suit and will ascertain the appropriate number of Laser Diodes for the same purpose.

32.     As set forth in the jointly drafted correspondence dated April 27, 2001, counsel have agreed at this time that it is not necessary to produce every process traveler or other form document generated in the manufacture and production of the products at issue, but instead will produce samples of such form documents.

As for privilege log, the parties agree that the log will not cover any document generated after the date of the filing of this lawsuit.  The log will be exchanged at a mutually agreeable date.  It will cover the prosecution of the five patents in suit and related patents.  It will cover any dispute between Nakamura and Nichia.  The parties presently agree, reserving the right to change the agreement, that it will not cover litigation in Japan.  The parties will revisit the issue of what communications or work product involving the in-house counsel must be listed on the privilege log.  As of now, there is no need to list in the log any communications or work product involving in-house counsel.

All dates for noticed depositions are suspended pending mutual agreement between the parties concerning rescheduling depositions.

Additionally, there are certain categories of document requests we have agreed to defer discussion until a later date.

D. Randal Ayers
Meyers Bigel Sibley & Sajovec, P.A.
May 10, 2001
Page 5


Also, each party will endeavor to supplement its answers to interrogatories by June 2, 2001. I suggest that if we can agree to the production of the documents set forth in this letter, the parties should endeavor to produce the documents by June 2, 2001. Further, if particular categories of documents are not going to be available by June 2, 2001, I suggest that the producing party will notify all other parties by June 2, 2001, of these categories.

Very truly yours,

Fay E. Morisseau

FEM:wc:mah
cc:     Matthew D. Powers, Esq.
        David C. Radulescu, Esq.
        J. Anthony Penry, Esq.
        Mark A. Grant, Esq.

ORC 269243-1.059751.0011

MAILING ADDRESS:
PO Box 37428
RALEIGH, NC 27627

STREET ADDRESS:
SUITE 250
1 1 1 CORNING ROAD
CARY, NC 27511

(919) 854-1400
Fax (919) 854-1401

INTERNET:
mbss@carolinapatents.com
www.carolinapatents.com

D. Randal Ayers
David D. Beatty
Mitchell S. Bigel
Sorojini J. Biswas
Needham J. Boddie, II
James R. Cannon
Robert N. Crouse
Robert W. Glatz

Scott C. Hatfield
Erin P. Madill
Karen A. Magri
Robert M. Meeks
D. Scott Moore
James D. Myers
Timothy J. O'Sullivan

Julie H. Richardson
F. Michael Sajovec
Grant J. Scott
Kenneth D. Sibley
Robert J. Smith
Elizabeth A. Stanek
J. Michael Strickland
Richard P. Vitek*

INTELLECTUAL PROPERTY
PATENTS
TRADEMARKS
COPYRIGHTS
TRADE SECRETS

* Not Licensed in North Carolina
Licensed in California and Michigan

May 14, 2001

Fay E. Morisseau, Esq.
McDermott, Will & Emery
18191 Von Karman Avenue
Suite 500
Irvine, California 92612-0187

**VIA FACSIMILE**

Re: *North Carolina State University and Cree, Inc. v. Nichia Corporation and Nichia America Corporation*; Civil Action No. 5:00-CV-703-F(2)

Dear Mr. Morisseau:

Thank you for your letter of May 10, 2001 memorializing our telephone conversations regarding various document production issues. While your letter generally reflects our conversations of May 2-3, 2001, a number of points require clarification and/or correction. These are as follows:

1. While we did agree to develop a list of documents that each side would produce, my understanding was that the list of documents we developed represented our attempt to identify categories of highly relevant and readily-identifiable documents that each side would be sure to produce prior to June 1, 2001. Consequently, both sides will still need to make a good faith effort to collect and produce other documents that are responsive to outstanding document requests. Thus, the categories of documents listed in your letter do not represent all the documents each side will need to produce, but instead reflect categories of documents for which both sides will expedite production to allow discovery to get under way as soon as possible.

2. We want to specifically confirm that the parties are agreeing to produce documents within the possession or control of any of their subsidiaries. Thus, with respect to both the categories of documents listed in your letter and the parties document requests in general, it is understood that Cree and Nichia will be producing responsive documents in the possession/control of Cree Lighting and Nichia America.

3. With respect to item 1 in your letter, my notes do not reflect any discussion of income tax returns. Additionally, you agreed that Nichia would produce all documents from

Nakamura's files and Nichia's employment/personnel files for Nakamura (see item 3 in May 1, 2001 Antonelli letter).

    4.     With respect to item 3 in your letter, it should also extend to copies of the listed documents to the extent they are within the possession or control of Nichia.

    5.     With respect to item 4, the patent application files would include patent application files in the possession or control of counsel for the parties, and would include prior art located in the patent application files.

    6.     With respect to item 5, the "ultimate parent" should be interpreted as being the earliest patent application, specifically including foreign patent applications, on which a claim of priority is based.

    7.     With respect to item 6, we did not agree to limiting Nichia's production to "the scope of Nichia's trade secret listing." The agreement was that both sides would produce the information with respect to all of their GaN LEDs and laser diodes.

    8.     With respect to item 7, we did not agree to limiting Nichia's production to "the scope of Nichia's trade secret listing." The agreement was that both sides would produce the information with respect to all of their GaN LEDs and laser diodes.

    9.     With respect to items 6-8, it is unclear as to whether this would only cover commercial products or would also cover research and development activities. Whatever is decided, the scope should be mutual.

    10.    With respect to items 6-8, Nichia also agreed to produce the specified information for any additional products (i.e., products other than GAN LEDs/laser diodes) that incorporate, embody, use or are made in accordance with any alleged trade secret or confidential information that forms the basis of any Nichia counterclaim.

    11.    With respect to item 10, "patent-in-suit" should be plural and understood to cover all five patents asserted in this litigation.

    12.    With respect to item 11, the parties agreed to produce all documents relating to ELOG work, not just "reports."

    13.    With respect to item 21, the "ultimate parent" should be interpreted as being the earliest patent application, specifically including foreign patent applications, on which a claim of priority is based. Additionally, documents relating to testing of the subject matter of the '010 patent should also be included.

    14.    With respect to item 25, this will clarify that "counterpart" refers to foreign counterparts."

15.    With respect to item 29, it should state GaN based semiconductor devices instead of GaN LEDs/laser diodes so as to encompass publications relevant to the '662 patent.

16.    With respect to item 31, Nichia also agreed to produce an appropriate number of samples of each Nichia product that incorporates, embodies, uses or is made in accordance with any alleged trade secret or confidential information that forms the basis of any Nichia counterclaim.

17.    Nichia also agreed to produce documents sufficient to identify each product made by Nichia that is covered by, or made by a process covered by, any of the Nichia patents-in-suit or any of Nichia's alleged trade secrets to the extent that the other documents Nichia produced did not provide this information (see items 11 and 20 in May 1, 2001 Antonelli letter).

18.    With respect to the production of documents, it is anticipated that each side will produce all the documents in the specified categories by June 1, 2001 (not June 2, 2001 -- which is a Saturday -- as indicated in your letter). In the event that selected of these documents cannot be produced by June 1, 2001 for some unanticipated and unavoidable reason, we concur with your suggestion that the parties notify each other of any such documents that will not be produced on June 1, 2001. We would further suggest that the parties also agree to notify the other party on June 1, 2001 as to why any such documents were not produced by June 1, 2001 and provide a date certain as to when the documents will be produced.

Very truly yours,

D. Randal Ayers

cc:    Donna M. Tanguay, Esq.
George L. Hampton, IV, Esq.
Robert W. Johnson, Esq.
Mark A. Grant, Esq.
David C. Radulescu, Esq.
Matthew D. Powers, Esq.

that are not the subject matter of the lawsuit. For example, why should Nichia produce information about a trade secret developed in 2001 after Nakamura left Nichia's employment?

     8.     See the response to number 7 above.

     9.     I suggest that it should cover commercial products. I'm not sure there would be specifications on research and development products and processes.

     10.     No disagreement.

     11.     No disagreement.

     12.     My notes indicate that we limited this to reports. The problem with a general request for "all documents relating to ELOG" is that it is too broad. It would cover such things such as invoices for materials and equipment used, documents evidencing payment to individuals working on ELOG, every note of every employee relating to ELOG, etc. If you want to broaden it to some reasonable scope, please let me know.

     13.     My notes indicate that we never talked about "testing". What does this mean? (i.e, testing in R&D, testing of materials used in products, testing of finished products). Why is this relevant?

     14.     No disagreement.

     15.     No disagreement.

     16.     My notes indicate that we never talked about this in our telephone conversations. I don't know why this is relevant, but I will see if there are any Nichia commercial products that don't fall within the scope of also being covered by one of the patents in suit.

     17.     I don't understand this at all. If we produce samples of commercial products and product specifications, why would we also have to produce documents identifying these products? Wouldn't the samples and product specifications be sufficient? What additional information could be gleaned from these additional documents?

     18.     This sounds reasonable.

Very truly yours,

Fay E. Morisseau

FEM:svw

PATENT LAWYERS

MAILING ADDRESS:
PO BOX 37428
RALEIGH, NC 27627

STREET ADDRESS:
SUITE 250
111 CORNING ROAD
CARY, NC 27511

(919) 854-1400
Fax (919) 854-1401

INTERNET:
mbss@carolinapatents.com
www.carolinapatents.com

D. Randal Ayers
David D. Beatty
Mitchell S. Bigel
Sorojini J. Biswas
Needham J. Boddie, II
James R. Cannon
Robert N. Crouse
Robert W. Glatz

Scott C. Hatfield
Erin P. Madill
Karen A. Magri
Robert M. Meeks
D. Scott Moore
James D. Myers
Timothy J. O'Sullivan

Julie H. Richardson
F. Michael Sajovec
Grant J. Scott
Kenneth D. Sibley
Robert J. Smith
Elizabeth A. Stanek
J. Michael Strickland
Richard P. Vitek*

INTELLECTUAL PROPERTY
PATENTS
TRADEMARKS
COPYRIGHTS
TRADE SECRETS

* Not Licensed in North Carolina
Licensed in California and Michigan

May 15, 2001

Fay E. Morisseau, Esq.                           **VIA FACSIMILE**
McDermott, Will & Emery
18191 Von Karman Avenue
Suite 500
Irvine, California 92612-0187

Re: *North Carolina State University and Cree, Inc. v. Nichia Corporation and*
     *Nichia America Corporation*; Civil Action No. 5:00-CV-703-F(2)

Dear Mr. Morisseau:

Thank you for your letter of May 14, 2001. The numbered paragraphs below correspond to the numbered paragraphs in your letter in which we were not in complete agreement:

1.     You are correct that the parties did not agree to produce the specific documents, as both sides reserved the right to withhold documents based on objections such as privilege, relevance, etc. You are also correct that we did not agree to produce all documents by June 1, 2001, although we did agree that both sides would endeavor to produce the documents that correspond to the categories we discussed (and are not otherwise objected to) by that date. If you do not believe that Nichia will be able to produce documents responsive to the vast majority of categories by June 1, 2001 we would request that you advise us immediately and provide some indication as to when the documents will be ready for production.

3.     We are amenable to including in category 1 of your May 10, 2001 letter tax records sufficient to reflect Nakamura's income in the United States.

4.     We will provide you with the telephone numbers.

7.     My notes contain no such limitation. Cree is clearly entitled to process (and product) specifications for not only products covered by Nichia's asserted trade secrets, but also for (i) products covered by the Nichia patents-in-suit and (ii) products potentially covered by the NCSU patent-in-suit (i.e., all ELOG products). Thus, we believe that both parties should produce the specifications for all GaN LEDs and laser diodes for the indicated time periods. If Nichia has GaN LEDs and laser diodes that it contends are not covered by any of the trade

secrets or patents-in-suit please notify us and we can then discuss whether or not production would be appropriate with respect to such products.

8.    See the response to number 7 above.

9.    We are amenable to your suggestion, at least with respect to this first round of production.

12.    We would suggest that both sides produce all inventor notebooks and other writings reflecting the conception, development and testing of any GaN ELOG products or the research that led to the conception/development of those products.

13.    By "testing" we are interested in any defect density tests/analyses (and supporting materials) performed with respect to the '010 patent and/or the research/products which led to the '010 patent. The request for such test results is included in Matt Antonelli's May 1, 2001 letter.

16.    This was a point of discussion in our telephone conversations. My understanding is that various of the asserted Nichia trade secrets are outside the GaN LED/LD area. With respect to these trade secrets, we are entitled to information regarding Nichia products that embody those trade secrets as Nichia's sales of those products may have placed the trade secret in the public domain and/or limited the economic value of the trade secret (if it is discoverable via reverse engineering).

17.    The samples and product specifications will be sufficient. It is only in the event samples/product specifications are not available for certain products that we would require additional information.

Very truly yours,

D. Randal Ayers

cc:    Donna M. Tanguay, Esq.
       George L. Hampton, IV, Esq.
       Robert W. Johnson, Esq.
       Mark A. Grant, Esq.
       David C. Radulescu, Esq.
       Matthew D. Powers, Esq.

United States District Court, S.D. California.

**The REGENTS OF THE UNIVERSITY OF CALIFORNIA, a public, non-profit educational California corporation and IDEXX LABORATORIES, INC., a Delaware corporation,**
**Plaintiffs,**
v.
**SYNBIOTICS CORPORATION, a California corporation, Defendant.**

**CIV. No. 93-822GT.**

Oct. 13, 1993.

ORDER

GORDON THOMPSON, Jr., District Judge.

*1 On September 23, 1993, Plaintiffs, The Regents of the University of California and IDEXX Laboratories, Inc. ("UC/IDEXX"), Renewed Motion for a Preliminary Injunction to prevent Defendant, Synbiotics Corporation ("Synbiotics") from making, using and selling its VIRACHEK/FIV test products during the pendency of this lawsuit came on for hearing before the Court. Both parties submitted supporting memorandums, proposed Findings of Facts and Conclusions of Law. Synbiotics filed objections to the UC/IDEXX's proposed Findings of Fact and Conclusions of Law. Additionally, Synbiotics' Motion to Strike the Declarations of William Respess ("Respess"), William Hardy ("Hardy") and Myron Essex ("Essex") and Objections to and Appeal from Magistrate Judge McCue's Protective Order and Denial of Defendant's Motion for a Continuance of this hearing date were heard. The Court has fully considered this matter, including the voluminous documents and exhibits presented by both parties.

*BACKGROUND*

On July 28, 1993, UC/IDEXX's Motion for Preliminary Injunction came on for hearing before the Court. The Court denied the motion because Plaintiffs failed to produce sufficient evidence to support an allegation of infringement of the '602 patent. The Court also found that it was unlikely that Synbiotics could prove the '602 patent invalid. At the close of the hearing, UC/IDEXX requested

renewal of its motion for preliminary injunction so they could submit evidence of infringement. The Court granted that request. Synbiotics then requested permission to revisit the issue of patent validity. The Court granted that request as well.

*CONCLUSIONS OF LAW*
A. *Objections to and Appeal of Magistrate's Order*

Synbiotics is objecting to and appealing Magistrate Judge McCue's protective order which limited discovery at this time to the issues of infringement only. The order prohibited discovery on issues of validity or invalidity of the '602 patent. Additionally, Magistrate McCue denied Synbiotics' request to continue this hearing on the renewal of UC/IDEXX's motion for preliminary injunction. Synbiotics argues that since this Court allowed it to revisit the issue of patent invalidity, Magistrate McCue's discovery rulings are in error. Synbiotics claims that it is severely prejudiced because it has not been allowed to depose Respess, Hardy and Essex. (Synbiotics also has a motion to strike these declarations). These arguments are without merit.

Basically, Synbiotics is using discovery issues to delay this hearing of UC/IDEXX's renewed motion for preliminary injunction. Synbiotics waited until August 26th, a week before its opposition was due, to attempt to take any depositions or serve any written discovery requests. Synbiotics noticed five depositions of witnesses located throughout the country (Essex in Florida, Hardy in New Jersey, Yamamoto in Florida and Pedersen and Respess in California) to be completed in about ten days. Synbiotics also requested 11 categories of documents from each witness. UC/IDEXX moved for a protective order and to quash the subpoenas because discovery could not be completed at that late date without continuing the motion hearing date for the preliminary injunction. Also, discovery at that late of a date would be unduly burdensome. Magistrate McCue agreed with UC/IDEXX and issued the protective order and denied Synbiotics' request for a continuance of this hearing.

*2 Magistrate McCue's decision on the discovery issues is not "clearly erroneous." *See Bhan v. NME Hospitals, Inc.,* 929 F.2d 1404, 1414 (9th Cir.1991), *cert. denied* 112 S.Ct. 617 (1992). First, when this Court allowed Synbiotics to revisit the issue of patent validity, it did not grant or prohibit additional

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

discovery on this issue. However, the Court did state that it wanted post-haste discovery and to get this case to trial. Synbiotics waited until the end of August to notice the depositions and serve the subpoenas. Synbiotics argues it waited until the end of August because UC/IDEXX did not file their renewed motion for preliminary injunction until August 17, 1993. However, because of the proceedings on July 28, 1993, Synbiotics was well aware the UC/IDEXX would file a renewed motion. Additionally, it is within the discretion of the Magistrate to decide discovery issues and keep the case moving forward. Second, Synbiotics' discovery issues are thinly veiled delay tactics. If Synbiotics is prejudiced at all, it is prejudiced by its own delay in noticing the depositions and serving the subpoenas. Therefore, Magistrate McCue's order is upheld.

### B. *Motion to Strike Declarations*

Synbiotics moves to strike the declarations of Respess, Hardy and Essex. These declarations are in support of UC/IDEXX's motion for preliminary injunction and cited in their proposed Findings of Fact and proposed Conclusions of Law submitted with their Renewed Motion for Preliminary Injunction. UC/IDEXX first submitted declarations of Hardy and Essex with their original Motion for Preliminary Injunction and first submitted the declaration of Respess with their Reply for the original Preliminary Injunction. Synbiotics moves to strike these declarations because it has not had the opportunity to depose the declarants. In the alternative, Synbiotics requests a two week postponement of this hearing so that it may depose the declarants and file a sur-reply.

Again, Synbiotics' requests are thinly disguised delay tactics. As stated above, Synbiotics did not notice the depositions of the three declarants until August 26, 1993. Additionally, Synbiotics served subpoenas on the declarants that required the production of numerous documents. Magistrate McCue issued a protective order because these discovery requests were untimely and unduly burdensome. Furthermore, although Magistrate McCue's order did permit Synbiotics to depose Respess, Synbiotics has not deposed Respess. If Synbiotics is prejudiced by the lack of discovery, it is because of its own delay in requesting the discovery materials. Therefore, Synbiotics' Motion to Strike the Declarations is denied.

Synbiotics also asserts procedural and evidentiary objections to the submitted declarations. For example, Synbiotics asserts that the declarations could only be filed with UC/IDEXX's original moving papers for preliminary injunction. But since the Court granted UC/IDEXX permission to renew its preliminary injunction motion, this argument is meritless. Synbiotics also argues that Fed.R. of Evid. 705 is violated because Synbiotics has not cross-examined the declarants. However, Rule 705 states that the expert *may* be required to disclose underlying facts or data on cross-examination. Rule 705 does not require cross-examination as Synbiotics suggests. Finally, Synbiotics states that Fed.R. of Evid. 403 would be violated by consideration of the declarations. But Synbiotics does not state how or why the probative value of the declarations substantially outweighs the prejudice. Accordingly, these arguments are baseless and Synbiotics' Motion to Strike the Declarations is denied.

### C. *Motion for Preliminary Injunction*

**\*3** District courts may grant preliminary injunctions to prevent patent infringement. 35 U.S.C. § 283 states, in pertinent part:

> The several courts ... may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable.

To obtain a preliminary injunction under this section, the party must establish a right to the injunction in light of four factors: 1) a reasonable likelihood of succeeding on the merits; 2) irreparable harm if the injunction is not granted; 3) the balance of hardships tips in the petitioner's favor; and 4) the impact of the injunction on the public interests. *We Care, Inc. v. Ultra-Mark Int'l Corp.,* 930 F.2d 1567, 1570 (Fed.Cir.1991). Each individual factor is not dispositive. Rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested. *Hybritech Inc. v. Abbott Laboratories,* 849 F.2d 1446, 1451 (FedCir.1988). The grant or denial of a preliminary injunction is within the discretionary authority of the district court. *We Care,* 930 F.2d at 1570. The district court's determination will not be overturned unless it abused its discretion by committing an error of law or seriously misjudged the evidence. *Id.*

1. Reasonable Likelihood of Success on the Merits

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

The first factor, in seeking a preliminary injunctions under § 283, requires the party seeking a preliminary injunction to establish that it stands to have a reasonable likelihood of success on the merits when the court finally adjudicates the dispute. *Hybritech, Inc.,* 849 F.2d at 1451. To meet this first factor, the patent holder must establish a likelihood of success on the merits on both the validity of its patent and infringement of the patent. *Id.*

In the previous hearing on UC/IDEXX's motion for preliminary injunction, the Court found that it was unlikely that Synbiotics would be able to prove that the '602 patent is invalid and that UC/IDEXX did not submit sufficient evidence of patent infringement. Since the Court allowed both issues of the validity and the infringement of the '602 patent to be re-addressed, these issues are discussed below.

a. Validity of the Patent

In a patent infringement case, the burden of proving invalidity is with the party attacking the validity of the patent. *H.H. Robertson, Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 387 (Fed.Cir.1987). However, at the preliminary injunction stage, because of the extraordinary nature of the relief, the patentee bears the burden of showing a reasonable likelihood that the attack on its patent will fail. *Id.*

Synbiotics attacks the validity and enforceability of the UC/IDEXX patent on four grounds: 1) the patentability of Claim 1 of the '602 patent is based solely on the non-obviousness of the discovery of the FIV virus. Consequently, according to Synbiotics, the role of Marlo Brown in the discovery of the FIV virus is crucial to the determination of the validity and the enforceability of the '602 patent; 2) Marlo Brown was a co-discoverer of the FIV virus; 3) the validity of the '602 patent is inextricably linked to the re-examined and rejected '753 patent; and 4) the '602 patent is unenforceable because of knowing concealment of material prior art. For the reasons stated below it is unlikely that Synbiotics will be able to prove the '602 patent is invalid or unenforceable.

i) Patentability of Claim 1

\*4 Synbiotics argues that the patentability of Claim 1 of the '602 patent is not in the detection methodology for the FIV virus but with the discovery of the FIV virus. Synbiotics asserts that

the *only* argument for patentability is that the discovery of the FIV virus was novel and non-obvious. Synbiotics asserts that the detection methodology "admittedly is old."

The consistent criterion for determination of obviousness is whether the prior art would have suggested to one of ordinary skill in the art that this process should be carried out and would have a reasonable likelihood of success, viewed in the light of the prior art. *In Re Dow Chemical Co.,* 837 F.2d 469, 470 (FedCir.1988). Both the suggestion and the expectation of success must be founded in the prior art, not the applicant's disclosure. *Id.* When combining references, there must be a suggestion in the references, or in the prior art as a whole, that would lead a person with ordinary skill in the art to make the combination. *Uniroyal, Inc. v. Rudkin-Wiley Corp.,* 837 F.2d 1044, 1052 (Fed.Cir.1988).

Synbiotics has failed to show that the claims of the '602 are obvious. Synbiotics has attempted to combine five prior art references with statements made in the '602 patent disclosure to assert that it would have been obvious to screen for and isolate the FIV virus. However, Synbiotics has failed to show there is any suggestion in any of the five prior art references that would lead one with ordinary skill in the art to combine the references or that these references make obvious the screening and isolation of FIV. Three of the references cited by Synbiotics describe prior identification and isolation of *other* cat viruses. The two references cited by Synbiotics which describe the prior identification of immunodeficiency viruses in humans and monkeys do not provide the requisite suggestion that analogous viruses would be present in non-primate species. Additionally, the declarations of Dr. Jarrett and Synbiotics' counsel rely heavily on statements in the '602 patent disclosure as the basis for Synbiotics' argument that the '602 patent is obvious. This argument must be disregarded because the '602 patent can not be used as prior art against itself. For these reasons, Synbiotics obviousness argument will probably fail.

Additionally, UC/IDEXX submitted the declarations of Drs. Essex and Hardy to support its position that the '602 patent is non-obvious. These declarations refute Synbiotics' assertions that Drs. Pedersen and Yamamoto merely applied known techniques to isolate the FIV virus. The Essex and Hardy declarations also support the conclusion that Drs. Pedersen and Yamamoto applied techniques

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

beyond the level of ordinary skill to accomplish something that was not expected. Accordingly, UC/IDEXX have shown that Synbiotics' obviousness argument would probably fail at trial.

ii. Marlo Brown as Co-Discoverer of the FIV Virus

Synbiotics asserts that Brown was a co-discoverer of the FIV virus used to develop the diagnostic methods claimed in the '602 patent. Brown owned a "cattery" and observed that her cats had symptoms resembling human AIDS. When the cats tested negative for feline leukemia, Brown brought her cats to the doctors at UC Davis who subsequently isolated the FIV virus as the cause of the illness and derived a means of diagnosing FIV in cats. Synbiotics asserts Brown's contribution was compelling and she should be considered a co-discoverer of the FIV virus. This argument is meritless.

*5 Joint invention connotes collaboration of effort to produce a complete and operative invention. *Garrett Corp. v. United States,* 422 F.2d 874, 881 (Ct.Cl.1970). One who merely suggests an idea of a result to be accomplished, rather than the means of accomplishing it, is not a joint inventor. *Id. See also Amgen, Inc. v. Chugai Pharmaceutical Co.,* 927 F.2d 1200, 1206 (Fed.Cir.1991). In *Garrett,* the Court held that a person who only suggests a broad idea (wherein the idea is obvious in view of prior art) without further participation or responsibility for making the invention complete and operable is not a joint inventor. *Garrett,* 422 F.2d at 881. In *Amgen,* the Court held that conception requires both the idea of the invention's structure and possession of an operative method of making it. *Amgen,* 927 F.2d at 1206. In some instances the inventor is unable to establish a conception until he or she has reduced the invention to practice through a successful experiment. *Id.*

Synbiotics' argument that Brown is a co-discoverer or inventor of the '602 patent is unpersuasive. The claimed invention of the '602 patent comprises methods for diagnosing whether a cat is infected with the FIV virus. At most, Brown suggested that her cats showed symptoms of an immunosuppressive disease and provided UC Davis with the infected cats. On the other hand, Drs. Pedersen and Yamamoto's discovery included the identification of a complete and operative method for isolating the new virus, actually isolating the new virus, and a complete and operative method for diagnosing cats

that are infected with FIV virus. Brown can hardly be deemed a co-inventor or discoverer. Therefore, Synbiotics' co-discoverer argument attacking the validity of the patent will probably fail.

iii. The '753 Patent

Next, Synbiotics argues that the validity of the '602 patent is "inextricably linked to the reexamined and rejected '753 patent." The '753 patent claims the FIV virus itself. Synbiotics' argument is that the '602 patent is based solely on the non-obviousness of the discovery of the FIV virus, that the reexamination of the '753 patent calls into question the non- obviousness of the discovery of the FIV virus, and therefore the validity of the '602 patent is questionable. This argument is also meritless.

As shown above, the validity of the '602 patent does not rest solely on the non-obviousness of the discovery of the FIV virus. UC/IDEXX has submitted declarations to support the conclusion that Drs. Pedersen and Yamamoto applied techniques beyond the level of ordinary skill to accomplish something that was not expected, the method for isolating the virus and diagnosing cats infected with the virus. Additionally, on September 14, 1993, the Patent and Trademark Office mailed a Notice of Intent to Issue Reexamination Certificate to UC's patent counsel. This notice confirmed the patentability of the three claims in the '753 patent. Therefore, this attack on the validity of UC/IDEXX's patent would fail.

iv. Knowing Concealment of Material Prior Art

*6 Synbiotics' final argument is that theUC/IDEXX patent is unenforceable because UC allegedly failed to disclose specific references and Brown's role in the discovery of the virus to the PTO. However, Synbiotics cites no law to support its argument that such conduct, if it occurred, renders the patent unenforceable. Therefore, this argument is without merit.

b. Patent Infringement

Granting a preliminary injunction does not require that infringement be proved beyond all question or that there be no evidence to support the viewpoint of the infringer. *H.H. Robertson,* 820 F.2d at 390. The grant is based on the likelihood that the patentee will meet its burden of proving infringement at trial. *Id.*

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

In UC/IDEXX's original Motion for Preliminary Injunction, they asserted that Synbiotics admitted infringement of the '602 patent. UC/IDEXX pointed to two declarations, submitted by Synbiotics, to support this argument. The declaration of Synbiotics' President and Chief Executive Officer, Robert L. Widerkehr stated in relevant part:

5. I was informed by Synbiotics counsel prior to the time the complaint was filed that the claims of the '602 patent cover the use of the FIV diagnostic products competitively marketed by IDEXX and by Synbiotics.

The declaration of Gregory A. Soulds, Synbiotics' Vice President, Business Development and Strategic Planning, stated in relevant part:

4. Prior to the institution of this litigation on November 23, 1992, Synbiotics obtained a formal written opinion that it was reasonable to believe that the '602 patent, if litigated would be held invalid. Such counsel also advised, however, that Synbiotics should expect a court to hold that the '602 patent, if valid and enforceable, is infringed by Virachek FIV product which Synbiotics launched November 23, 1992.

Since the Court's ruling on July 28, 1993, Synbiotics' counsel stated in a letter "For purposes of the preliminary injunction motion, Synbiotics will not contest infringement of Claim 1." Additionally, in its opposition, Synbiotics stated that for the purposes of the preliminary injunction motion, it would not contest infringement of Claim 1. It is clear, based on this evidence, that Synbiotics has admitted infringement of Claim 1 of the '602 patent.

In addition, UC/IDEXX submitted the declaration of Respess and the deposition testimony of Mr. Clifford Frank ("Frank"), Synbiotics' Director of Operations. These declarations further support UC/IDEXX's claim of infringement of the '602 patent. Additionally, Frank's deposition testimony supports UC/IDEXX's position that Claim 3 of the '602 patent is infringed as well.

2. Irreparable Harm

The second factor to consider when granting a preliminary injunction is irreparable harm. At the July 28, 1993 hearing the Court held that UC/IDEXX had not shown infringement and therefore was not entitled to a presumption of irreparable harm. Immediate irreparable harm may be presumed when a clear showing has been made of patent validity and continuing infringement. *Smith Int'l v. Hughes Tool Co.,* 718 F.2d 1573, 1581 (Fed.Cir.1983).

*7 As stated above, UC/IDEXX have made a clear showing of patent validity. Since Synbiotics does not contest the infringement of Claim 1, there is a clear showing of continuing infringement. Additionally, UC/IDEXX submitted proof of a 39% loss of market share, which indicates they are being irreparably harmed by the continuing infringement. Accordingly, UC/IDEXX have satisfied the requirement of showing irreparable injury.

3. Balance of Hardships

The district court must balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted. *Hybritech,* 849 F.2d at 1457. In the July 28, 1993 hearing, the Court found that the balance of hardships does not favor either side, that both sides would be heavily affected.

4. Public Interest

The focus of the district court's public interest analysis is whether there exists some critical public interest that would be injured by the grant of the preliminary injunction. *Hybritech,* 849 F.2d at 1458. In the July 28, 1993 hearing, the Court found that the public interest in protecting the rights secured by valid patents and enforcing the validity of the patent outweighs any other public interest or consideration in this case. *See Hybritech,* 849 F.2d at 1458.

5. Conclusion for Preliminary Injunction Motion

Weighing all four factors, the Court is granting a preliminary injunction, enjoining Synbiotics from making, using and selling its VIRACHEK/FIV product during the pendency of this lawsuit. UC/IDEXX have shown a reasonable likelihood of success on the merits, irreparable harm, and a public interest in the enforcement of their patent. Although the balance of hardships does not tip in either party's favor, weighed against the strong showing by UC/IDEXX on the other three factors, a preliminary injunction is appropriate in this case.

IT IS ORDERED that:
Defendant's Objections and Appeal from

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Magistrate McCue's Protective Order and Denial of Defendant's Motion for a Continuance of this hearing date is DENIED.

Defendant's Motion to Strike the Declarations of William Respess, William Hardy, and Myron Essex is DENIED.

UC/IDEXX's Motion for Preliminary Injunction is GRANTED. Therefore, Synbiotics Corporation is preliminarily enjoined from making, using and/ or selling any product or kit within the scope of Claim One (1) of U.S. Patent No. 5.118,602 and including any product and/or kit presently sold or offered for sale by Synbiotics under the mark VIRACHEK/FIV.

IT IS SO ORDERED.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works